OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

OPINION

of

JOHN K. VAN DE KAMP
Attorney General

JACK R. WINKLER
Assistant Attorney General

:
:
:
:
:
:
:
:
:
:
:
:

No. 89-403

AUGUST 21, 1989

---

THE HONORABLE G. W. CLEMONS, DIRECTOR OF THE DIVISION OF LAW ENFORCEMENT OF THE CALIFORNIA DEPARTMENT OF JUSTICE, has requested an opinion on the following question:

Does the playing of jackpot poker for money in California violate state laws prohibiting lotteries?

CONCLUSION

Jackpot poker played for money in California is unlawful because it violates the constitutional and statutory proscriptions against lotteries.

ANALYSIS

We are advised that an activity known as "jackpot poker" has developed in connection with the playing of lowball poker in cardrooms where such games are not prohibited by local ordinance. (See § 337s[1]; *In re Farrant* (1960) 181 Cal.App.2d 231 regarding authority of cities and counties to prohibit gaming by ordinance) We understand that lowball poker is a form of draw poker (see § 337s) in which low cards instead of high cards determine the winning hands. We assume that the lowball poker referred to is not played as a banking or percentage game and therefore does not violate section 330 of the Penal Code. (See *Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673 and 2 Ops.Cal.Atty.Gen. 378, 379.) While the cardroom operator does not participate in the card games (which may make them banking games prohibited by § 330) we understand that a fee is charged each player for the privilege of participating in the card games.

In the game of draw poker, including lowball poker, each player "antes" an agreed amount to the "pot" before play starts. The cards are then dealt to each player. The players then bet by placing more in the pot or "fold" withdrawing from the game depending upon the strength of their

---

[1]Section references are to the Penal Code unless otherwise indicated.

hands. Those who bet discard unwanted cards and "draw" the same number of new cards from the dealer in an attempt to improve their hands. The players then bet by placing more in the pot or fold, withdrawing from the game. The player remaining in the game having the best poker hand as determined by the rules of the particular form of draw poker being played, wins the pot.

In jackpot poker a fixed sum is withdrawn from the pot in each game of lowball poker played which is placed in a separate fund known as the "jackpot". In some cases the operator of the cardroom places money in the jackpot from other sources, especially when the jackpot is low. The money in the jackpot accumulates until a player in a lowball game achieves a hand with a particular combination of cards under specified conditions which make him the winner of all the funds in the jackpot. As explained to us the best possible lowball hand is a five-four-three-two-ace, often called a "wheel" and the second best hand is a six-four-three-two-ace, often called a "sixty-four". Under the jackpot poker rules the winner of the jackpot is the player who holds a "sixty-four" hand when another player has a "wheel" and thus wins the pot. The jackpot feature does not interfere with the regular lowball poker play except for the withdrawal from each pot for the jackpot.

We are asked whether jackpot poker violates state laws prohibiting lotteries. Article IV, section 19 of the California Constitution provides:

"(a) The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State.

"(b) The Legislature may provide for the regulation of horse races and horse race meetings and wagering on the results.

"(c) Notwithstanding subdivision (a) the Legislature by statute may authorize cities and counties to provide for bingo games, but only for charitable purposes.

"(d) Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery.

"(e) The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."

Section 319 of the Penal Code provides:

LOTTERY DEFINED. A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.

Setting up a lottery is made a misdemeanor by section 320.

A lottery has three essential elements: (1) a prize; (2) distributed by chance; and (3) consideration. (*California Gasoline Retailers* v. *Regal Petroleum Corporation* (1958) 50 Cal.2d 844, 851.) Thus, as used in California law "lottery" is a generic term which includes many diverse forms of gambling which incorporate its three elements, including:

(a) A suit sale promotion; *People* v. *Hecht* (1931) 119 Cal.App. Supp. 778.

(b) A contest picking titles for cartoons; *People* v. *Rehm* (1936) 13 Cal.App.2d Supp. 755.

(c) "Chain letter store;" *Niccoli* v. *McClelland* (1937) 21 Cal.App.2d Supp. 759.

(d) Theatre cash night; *People* v. *Gonzales* (1944) 62 Cal.App.2d 274.

(e) Raffle of free haircuts; 30 Ops.Cal.Atty.Gen. 233 (1957).

(f) Ringo (bingo with a ring toss); *People* v. *Shira* (1976) 62 Cal.App.3d 442.

(g) Keno; 64 Ops.Cal.Atty.Gen. 114 (1981).

(h) Casino Night; 71 Ops.Cal.Atty.Gen 139 (1988).

The statutory definition of lottery refers to the prize as "property" without any restrictive words and it has been held that in section 319 it is used in its most general sense and includes real and personal property, money, goods, chattels, things in action, evidence of debt and obligations. (*People* v. *Settles* (1938) 29 Cal.App.2d (Supp.) 781, 786.) It seems clear that the money, or chips or other devices which may be converted to money or property, in the jackpot of jackpot poker would qualify as a prize under the statutory definition of a lottery. There is no requirement that the prize come from a particular source such as the consideration paid by the participants. See section 319, *supra*, and 71 Ops.Cal.Atty.Gen. 139 in which the prizes for the casino night were provided as gifts from local merchants and the ticket proceeds benefitted charities. Thus the fact that the jackpot consists of money provided wholly or in part by the operator rather than money paid by the players does not prevent it from constituting a prize for the purpose of the lottery laws.

The consideration element of a lottery is to be determined from the standpoint of those who might win the prize, not from the standpoint of those who are conducting the event. (*People* v. *Cardas* (1933) 137 Cal.App.(Supp.) 788, 791.) This follows from the statutory definition that it is the distribution of property by chance "among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it." (*California Gasoline Retailers* v. *Regal Petroleum Corporation, supra*, p. 860.) In *People* v. *Cardas* (1933) 137 Cal.App. (Supp.) 788, 790-791 the court stated the question to be answered on the consideration element of a lottery in three ways. Was a valuable consideration paid for the chance of winning the prize by those who stood to win? Was anything of value hazarded upon the chance by them? Did the holders of the prize tickets pay a valuable consideration for the chance? In jackpot poker the only ones who stand to win the jackpot are those who play the lowball poker games. The players have each paid a fee for the privilege of becoming a player in the lowball games. In addition the lowball players must pay the ante and their bets into the lowball pot to maintain their eligibility to win the jackpot. These payments of the participation fee, antes and bets by the players constitute consideration for the chance to win the jackpot as well as for participation in and the chance to win the lowball pots. The consideration needed to make a transaction a lottery need not be paid exclusively for the chance to win the prize. It is sufficient that the consideration be paid for something else and the chance to win the prize. (*People* v. *Gonzales* (1944) 62 Cal.App.2d 274, 279-280; *Holmes* v. *Saunders* (1952) 114 Cal.App.2d 389, 390-391; *California Gasoline Retailers* v. *Regal Petroleum Corporation, supra*, p. 859.) Thus the fact that a fee is paid to the operator to participate in the lowball games as well as the jackpot and that the ante and bets are paid to win the lowball pot as well as the jackpot do not prevent such payments from being consideration paid by the players for the chance to win the jackpot.

The other element of a lottery is that the prize must be distributed by chance. In *People* v. *Settles* (1938) 29 Cal.App.2d (Supp.) 781 the defendants were convicted of conducting a lottery. The game operated by the defendants was tango (a game similar to bingo) with the added requirement that to win the prize after covering a row on his card the player had to throw three darts at a circle and land all three darts within the circle. On appeal the defendants contended, inter alia, that the game was one of skill, not chance, and hence not a lottery. On this point the court stated:

> "A game is not to be regarded as one of skill merely because that element enters into the result in some degree, or as one of chance solely because chance is a factor in producing the result. The test of the character of a game or scheme as one of chance or skill is, which of these factors is dominant in determining the result? [citations] If both of these factors are present, the question of the character of such game or scheme in this respect is ordinarily one of fact."

The court observed that while the playing of tango was undoubtedly a lottery, citing its prior decision in *People* v. *Babdaty* (1934) 139 Cal.App.(Supp.) 791, the addition of the dart throwing requirement introduced an element of skill to the game and the jury might reasonably have found either way as to whether chance or skill was dominant in determining the result. The court reversed the judgment of conviction because of an erroneous instruction indicating that the jury need only find that some element of chance was involved in determining the winner to find the defendants guilty, not that chance was dominant over skill.

The *Settles* test was cited with approval by the Supreme Court in *In re Allen* (1962) 59 Cal.2d 5, 6. In that case the defendant was charged with violation of an ordinance which prohibited conducting or playing any game of chance with cards, dice or other device for money for permitting the game of bridge to be played for money in his establishment. The defendant sought release on habeas corpus claiming that the game of bridge was not a game of chance within the meaning of the ordinance. The supreme court stated:

> "The term `game of chance' has an accepted meaning established by numerous adjudications. Although different language is used in some of the cases in defining the term, the definitions are substantially the same. It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game." (Citing *People* v. *Settles*, *supra*, and a number of cases from other states.)

The *Allen* court examined the rules of bridge and concluded that it was predominantly a game of skill and on that basis granted the writ. While the *Allen* case did not involve a lottery, it is clear that the Supreme Court applied the same test to determine that bridge was not a game of chance that the *Settles* court used in determining whether the result was determined by chance under California's lottery laws. We must now apply that test to the question presented.

We are asked whether jackpot poker constitutes a lottery under state law. We will assume, without deciding, that the game of lowball poker, with which jackpot poker is associated, is a game of skill and thus not a lottery on the basis that the elements of skill dominate over the elements of chance in determining the winner. The principal issue presented by the question we are asked is whether skill or chance dominates in the determination of the winner of the jackpot in jackpot poker. To win the jackpot a player must not only remain in a lowball game with a "sixty-four" hand but another player in the same lowball game must win that game with a "wheel".

It has been suggested that since the play of the lowball game determines the winners of both the lowball game and the jackpot the same proportions of skill and chance determine the winners of both. We disagree. The rules which determine the winner of the jackpot are totally different from the rules determining the winner of the lowball games. The lowest hand of the players who haven't folded determines the winner of the lowball game and provide a winner for every lowball game. But the jackpot rules require that two players hold specific unusual hands in combination to make the holder of one of those hands the jackpot winner, an event which occurs very infrequently in the playing of many lowball poker games. As the Supreme Court said in the *Allen* case it is the character of the game as revealed by its rules that the courts look to in determining whether the elements of skill or chance predominate in determining the winner. The differences in the rules which determine the winner of the lowball games and the winner of the jackpot involve different elements of chance and skill. We therefore examine the rules determining the jackpot winner to determine whether the elements of skill or chance predominate.

Since the jackpot winner is determined by the cards held by the players who have not folded at the end of a lowball game the first step in determining the jackpot winner is the initial deal of the cards in the lowball game. The cards that each player is dealt are determined solely by chance if there is an honest deal as the rules require.[2] The second step is the discard, the only action a player may take which will affect what cards he will hold at the end of the game. There would appear to be little skill involved in making the discard if the player's objective is to win the jackpot. He would discard any card which was not part of a "sixty-four" hand which would make it possible for him to achieve a "sixty-four" hand by the draw. The third step which will determine the jackpot winner is the draw. If the cards received in the draw are dealt honestly as the rules require they are determined solely by chance as in the initial deal. Finally, for a player to win the jackpot another player must win the lowball game with a perfect hand, a "wheel", a matter which involves the same elements of chance and skill as obtaining a "sixty-four" hand. The betting would appear to have little impact on the determination of the winner of the jackpot. The player who holds a "sixty-four" hand or a potential "sixty-four" hand must match any bets made to remain in the game and remain eligible to win the jackpot. The player's decision to continue betting or fold may be influenced in some measure by the degree to which the betting indicates whether another player has a "wheel". But apart from these considerations the betting would appear to play no part in the determination of the winner of the jackpot. We are convinced that the courts would hold that the elements of chance predominate over the elements of skill in the determination of the winner of the jackpot in jackpot poker.

We conclude that jackpot poker, played in the manner described herein, constitutes a lottery which is prohibited by state law. Because it is a lottery the Legislature "has no power" to authorize jackpot poker by statute or otherwise. See article IV, section 19(a) of the California Constitution, *supra*.

\* \* \* \* \*

---

[2]The probability of being dealt a five high straight (a "wheel") on the initial deal is 1024 in 2,598,960 or one in 2538. (Scarne on Cards by John Scarne, Crown Publishers, N.Y., 1949, p. 281.) The probability of being dealt a "sixty-four" on the initial deal would be the same, one in 2538.